FILED
02/05/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2023 Session

## STATE OF TENNESSEE v. BOBBY MARABLE II

**Appeal from the Circuit Court for Gibson County**
**No. 19568   Clayburn L. Peeples, Judge**

_____

### No. W2022-01591-CCA-R3-CD
_____

The Defendant, Bobby Marable II, was convicted by a Gibson County Circuit Court jury of aggravated kidnapping involving bodily injury, a Class B felony, and aggravated assault by strangulation, a Class C felony, for which he is serving an effective thirty-five year sentence. *See* T.C.A. §§ 39-13-304(a)(4) (2018) (aggravated kidnapping involving bodily injury), 39-13-102(a)(1)(A)(iv) (Supp. 2015) (subsequently amended) (aggravated assault involving strangulation or attempted strangulation), -(e)(1)(A)(ii) (classifying aggravated assault involving strangulation as a Class C felony). On appeal, he contends that: (1) the evidence is insufficient to support his aggravated kidnapping conviction, (2) the trial court erred in its jury instructions on aggravated kidnapping, (3) the court erred in allowing the State to impeach the Defendant with his prior convictions under Tennessee Rule of Evidence 609, (4) he is entitled to relief due to the cumulative effect of the court's errors, and (5) the court erred in classifying him as a Range III, persistent offender for his aggravated assault conviction. We affirm the Defendant's convictions and the trial court's judgment for aggravated kidnapping, and we remand the case with instructions for the trial court to correct the Defendant's aggravated assault judgment to reflect a ten-year sentence as a Range II, multiple offender.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed, Case Remanded for Entry of Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and J. ROSS DYER, J., joined.

Rachele Scott Gibson (on appeal), District Public Defender; Kendal Stivers Jones (on appeal), Assistant Public Defender – Appellate Division; and Daniel J. Taylor (at trial), Jackson, Tennessee, for the appellant, Bobby Marable II.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Frederick H. Agee, District Attorney General; Scott Kirk, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to an incident in the late evening of May 9 and the early morning of May 10, 2016, in which he went to the victim's Milan home, choked her until she was unconscious, and took her while still unconscious to his Humboldt home, where he choked, spit on, and slapped her. The Defendant would not let the victim leave, but she escaped after several hours. The Defendant and the victim had been dating for about one month but had recently stopped seeing each other. Because the relevant events occurred in two jurisdictions, the present case relates to crimes which occurred within the jurisdiction of the Twenty-Eighth Judicial District, which includes Milan.

At the trial, Milan Police Officer Lee Geyra testified that the victim came to the police department around 9:00 p.m. on May 10, 2016 to report an incident of domestic violence which began at her home around midnight of the previous evening. He photographed her injuries. The photographs were received as an exhibit and depict bruising on the victim's legs and neck and a red spot on her eye. Officer Geyra noted that the victim's voice was raspy. Based upon the victim's report of a criminal incident, he obtained an arrest warrant charging the Defendant, whom he identified in the courtroom.

Officer Geyra identified an aerial photograph of the Defendant's mobile home neighborhood, and the photograph was received as an exhibit and showed homes closely situated to one another. Officer Geyra said that he did not go to the neighborhood to search for evidence, that he did not search the Defendant's car, and that no witnesses "c[a]me forward" to report a kidnapping. Officer Geyra agreed that the victim reported "she had left the area where the Defendant was" around 7:05 a.m.

Kristin Newberry testified that she had lived in the Defendant's neighborhood on May 10, 2016. She said that a "really anxious and nervous" woman came to her home between 7:00 and 8:00 a.m. on May 10 and that, after speaking with the woman, Ms. Newberry allowed the woman, whom she recognized from a local business, inside for a few minutes. Indicating the Defendant in the courtroom, Ms. Newberry said "[t]hat man" knocked on her door and asked if she had seen "a lady." She said that the Defendant was "nervous acting, jittery" and that she recognized the Defendant as her neighbor who lived "right behind" her. Ms. Newberry said the victim had been behind the front door and out of the Defendant's view and that she did not tell the Defendant that the victim was there because the victim seemed scared. Ms. Newberry said that after the Defendant left, she drove the victim to the victim's home in Milan and that they stopped at the victim's workplace for the victim to obtain money, which the victim gave to Ms. Newberry.

-2-

When shown aerial photographs of the Defendant's and her neighborhood, Ms. Newberry agreed that the homes were in close proximity and that the Defendant's home was "[v]ery close" to the one in which she lived at the time of the incident. She said that not all of the homes were occupied.

The victim testified that she and the Defendant were "starting to date" around May 10, 2016. The victim testified that she had been at her home in Milan, Gibson County, earlier in the day of the incident and that he had been there when she left to visit her mother and sister. She said that when she returned around 10:00 or 11:00 p.m., the Defendant was still there. She said her adult son was not home. The victim said the Defendant came from the home to her car immediately and that she did not have an opportunity to enter the home. She said that he "snatched [her] up" as soon as she opened her car door and choked her. She said he thought that she had been out with her "ex" and that he "snatched" her out of her car as soon as she opened her door and choked her until she was unconscious. She denied that he asked her for clothing he had left at her home. She denied that she wanted to "go get into his . . . truck" and that she told him she "wanted to go somewhere and talk." The victim said that she did not know how she ended up in the Defendant's truck and that when she regained consciousness, she lay on the Defendant's lap in his truck. She said she had not gotten into the truck voluntarily and that she did not know how she got inside it. When asked if the Defendant had asked her to get out of the truck and if she had scuffled with the Defendant inside the truck, she responded, "I was passed out."

The victim testified that after midnight, they arrived at a home in Humboldt which the Defendant identified as his. She said that when they arrived, the Defendant told her that if she did not get out of the truck, he would choke her again. She said he "attempted to choke [her] again," spit in her face, and slapped her. She said he called her profane and derogatory names. She said she went into the Defendant's home, where a woman she had never seen was present.

The victim testified that the woman asked the Defendant who the victim was and why the victim was there, that the Defendant did not answer, that the victim asked the woman who she was, and that the woman identified herself as the Defendant's fiancée. The victim said that when the Defendant stepped outside at a time she did not specify, she asked the woman who was present if she could help the victim get "out of there." The victim said the woman replied that the Defendant "wouldn't let her." The victim said she did not have her cell phone. The victim said that at some point, the woman and the Defendant went into another room. The victim acknowledged that she did not leave when they went into the other room. She said the Defendant did not stay in the other room and, "He kept pacing back and forth." She acknowledged that she fell asleep for several hours in the living room and that she had "a beer" earlier in the day.

-3-

The victim testified that she remained in the Defendant's home for "[o]ver four hours" because the Defendant would not let her leave. She said the Defendant and the woman fell asleep around 4:00 a.m., that the victim fell asleep till about 7:00 a.m., when she woke after 7:00 a.m. and left the home with her keys, which she had seen the Defendant place on the kitchen counter. The victim said she went to a nearby house and spoke to a neighbor, who allowed the victim to come inside.

The victim testified that while she was in the neighbor's home, the Defendant came to the home looking for the victim. The victim said she hid behind the door until the Defendant left. She said the neighbor readied the neighbor's children for school and that the neighbor, the children, and the victim left together in the neighbor's car. The victim said she lay in the car seat in order not to be seen. The victim said that after the woman dropped off the children at school, they went to the victim's workplace, where the victim obtained cash to give to the woman for driving the victim home. The victim said that the woman took her home and that the victim debated whether to alert the authorities, which she eventually did after being encouraged by others. She acknowledged that she was home for several hours and that she went to work before going to the police.

The victim testified that she went directly to the Humboldt Police Department after work. She later said she went during her meal break around 5:00 p.m. She said she had gone to report the incident but was told she had to report it to Milan authorities and agreed it had been within twenty-four hours of the incident. She said she went to the Milan Police Department and met with Milan Officers Geyra and Alexander. The victim identified photographs of her injuries, which she described as leg, arm, and neck bruises; a broken blood vessel in her eye; and scratches on her neck. She acknowledged that she had not sought medical treatment but said she should have.

The Defendant testified that he had known the victim for about four weeks in May 2016. He said he sometimes visited in her home and went to her mother's home on Mother's Day and the next day. He claimed that he had stopped seeing the victim at a point he did not identify and explained that he had been in a relationship with another woman. He said that two days after Mother's Day, the victim wanted to resume their relationship and that the alternative was for her to tell the Defendant's "old lady" that the Defendant had been to the victim's home and had clothing stored there. The Defendant said that he told the victim, who was at work, that he needed to retrieve his clothing and that, pursuant to her instructions, he went to her home to get the clothing. The Defendant said that the victim wanted him to remain at her home to talk to her after she returned from work.

The Defendant testified that he was coming out of the victim's home when she arrived from work. He said the victim's son was inside the home. The Defendant said he and the victim went inside to talk in the kitchen. He said that he told her that he did not want to see her anymore and that he felt bad for the "woman at home." The Defendant

testified that when he began leaving, the victim hit the back of his head with a broom handle. He said that the victim followed him to his truck and that she got inside, insisting that they talk. He said that he told her to get out of the truck and that she responded by kicking him. He said the victim put her arms behind the passenger and driver's seat, sat on the console, a foot on the dashboard control panel, and a foot on the sunroof. He said she damaged the dashboard control panel and the sunroof. He said he did not like being around the victim when she had been drinking because she became violent.

The Defendant denied choking or strangling the victim before she got into the truck. He said he did not touch the victim and that the only physical contact they had was when she kicked him while inside the truck. The Defendant said he told the victim he needed to get gas and that she was "under the influence . . . from Milan to Humboldt" and that she fell asleep in the truck. He said he had not forced the victim into his truck and that he did not "kidnap her in any way from her neighborhood."

The Defendant testified that he went to the Humboldt home he shared with his fiancée, "Queen," who looked upset when he arrived. The Defendant said he told the victim to get out of the truck and that he declined her request for permission to sleep in his truck. He said that he went inside and that the victim entered the home voluntarily about ten minutes later. He said that he sat on the floor by the door and that Queen and the victim sat on the couch talking until he and Queen went to bed less than one hour later, leaving the victim in the living room on the couch. The Defendant said that he did not force the victim to stay in the home overnight and that he did not restrain her or lock the door to keep her in the home. He denied taking the victim's keys.

The Defendant testified that he did not sleep and that he went to the living room to see where the victim went after he heard the door open the next morning. He said that he went to his neighbor's house and inquired if the victim were there and that the neighbor said the victim was not present. He said he went home but later went to the victim's home to drop off a laptop she had loaned him. He said that before he went to the victim's home, he had seen the victim leave with his neighbor. He said he had not tried to stop the victim and the neighbor when they left.

The Defendant testified that he had no intent to kidnap the victim or to commit an aggravated assault of her. He denied choking the victim. When asked if the victim "just choked herself out," the Defendant responded, "Either she did or she had some help." He acknowledged that he had three prior felony convictions. He agreed that he had been convicted of sexual battery by an authority figure and was unsure if he had one or two convictions for violating the sexual offender registry. Documents reflecting the Defendant's two convictions for violating the sexual offender registry were received as exhibits.

The trial court took judicial notice of the facts that in 2016, Mother's Day fell on Sunday, May 8; that May 9 was a Monday; and that May 10 was a Tuesday. The court informed the jury of these facts. The Defendant was then asked on redirect to identify the day on which the victim got into his truck and responded that it had been the day after Mother's Day. He denied that he had pulled the victim from his truck and forced her to go into his house. He said that he told her she could not sleep in his truck and that she "just came in" the home about ten minutes after he entered the home.

After receiving the evidence, the jury found the Defendant guilty of the charged offenses of aggravated kidnapping and aggravated assault. At the sentencing hearing, the trial court sentenced the Defendant to serve twenty years at 100% for aggravated kidnapping and fifteen years as a Range III, persistent offender for aggravated assault. The court ordered that the sentences be served consecutively. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his aggravated kidnapping conviction. He argues that the victim's injuries did not result from a removal or confinement of her from her property and were, instead, the result of the aggravated assault that occurred before he kidnapped the victim. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant here, "[a]ggravated kidnapping is false imprisonment . . . committed . . . [w]here the victim suffers bodily injury[.]" T.C.A. § 39-13-304(a)(4) (2018). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a) (2018). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id*. § 39-11-106(a)(2) (2014) (subsequently amended).

The Defendant argues that the injuries the victim suffered from the choking incident at her home provide the facts for the aggravated assault conviction, which was complete before the Defendant undertook to kidnap her. The Defendant argues, as well, that the victim sustained no injuries from the slap and attempted choking which occurred at the Defendant's home. Thus, the Defendant theorizes, the "removal and confinement did not cause [the victim's] bodily injuries" and cannot support a conviction for aggravated kidnapping. He acknowledges that the evidence is sufficient to support a conviction for kidnapping or false imprisonment, both lesser included offenses of aggravated kidnapping.

We reject the Defendant's argument for two reasons. First, the facts do not support the Defendant's contention that the victim had no injuries other than those attendant to the initial choking. Viewed in the light most favorable to the State, the evidence demonstrates that the victim came home to find the Defendant outside her home. He approached her car, forcibly removed her from it, and choked her to unconsciousness. When she regained consciousness, she was in the Defendant's truck. He took her to his home, threatened and attempted to choke her again, made her go inside his home, and would not let the victim leave.

The victim's injuries, which were documented by photographs and eyewitness accounts, included bruises on her neck, arms, and legs. She also had a bloodshot eye and a raspy voice. The Defendant argues, in part, that the victim had no injuries other than those from the initial choking at the victim's home. Although the neck bruising and the bloodshot eye are consistent with choking, the victim also had bruises on her legs and arms. Bruises constitute bodily injury. *Id.* The Defendant has not explained how, when the evidence is viewed in the light most favorable to the State, the arm and leg bruises should be attributed to choking. The arm and leg bruises constitute bodily injury which is separate from and in addition to the evidence which formed the basis for the conviction for aggravated assault via choking. *See State v. White*, 362 S.W.3d 559 (Tenn. 2012) (requiring a jury to determine, after being properly instructed, "whether the removal or confinement [required for a kidnapping] is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction"). The evidence shows, as well, that the Defendant removed the victim from outside her home and took her against her will to his home, thereby substantially interfering with her liberty.

-7-

Second, we have considered the Defendant's argument that the aggravated assault was a temporally separate event which was completed before the Defendant undertook to kidnap the victim. The Defendant argues that the language of the aggravated kidnapping statute requires that bodily injury must *result from* the removal or confinement. Viewing the evidence in the light most favorable to the State, we conclude that the Defendant's argument must fail. The evidence shows that the Defendant was upset because he thought the victim, whom he had been seeing romantically and whom had just arrived at her home, had been with her "ex." The Defendant approached the victim, pulled her from her car, and choked her to unconsciousness. When the victim regained consciousness, she was in the Defendant's truck, and he took her to his home and made her go inside with threats of more choking. He sat by the home's door and paced in the living room, and the victim was unable to leave until the Defendant eventually went to another room. The evidence supports a conclusion that the Defendant choked the victim in order to subdue her in furtherance of his effort to remove her from outside her home and transport her to his home, where he confined her against her will. As we have stated, the victim suffered bodily injury in addition to the choking, elevating the offense to aggravated kidnapping. Although the Defendant argues in his reply brief that the State is foreclosed from basing its argument on appeal on the bruising on the victim's arms and legs as constituting the bodily injury for aggravated kidnapping because the State did not make this argument to the jury, we note that the jury was the trier of fact and was entitled to consider all of the evidence presented and make relevant factual findings as to the existence of the elements of the offense. *See Jackson*, 443 U.S. at 319; *Vasques*, 221 S.W.3d at 521.

The evidence is sufficient to support the aggravated kidnapping conviction, and the Defendant is not entitled to relief on this basis.

## II

### Jury Instructions – Aggravated Kidnapping

The Defendant contends that the trial court erred in instructing the jury on modes of committing aggravated kidnapping which were not alleged in the indictment. The Defendant acknowledges that the issue was not raised contemporaneously but urges this court to grant him a new trial as a matter of plain error relief. The State responds that the issue is waived and that the Defendant cannot establish a basis for plain error relief. We agree with the State.

A trial court in a criminal case is required to give "a complete charge of the law applicable to the facts of the case[.]" *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn.1975). "[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge."

*Id.* The right is constitutional in nature. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002).

As the State has noted and the Defendant concedes, no objection to the instruction was raised in the trial court. Plenary review of this issue is waived. *See* T.R.A.P. 3(e), 36(a); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Relief is foreclosed unless granted as a matter of plain error. In order for an appellate court to grant plain error relief,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); *see State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). All five factors must be shown. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.; Adkisson*, 899 S.W.2d at 642.

As relevant here, the indictment charged that the Defendant "did unlawfully and knowingly remove or confine [the victim] so as to interfere substantially with [her] liberty and [she] suffered bodily injury, in violation of T.C.A. 39-13-304(a)(4)." The trial court instructed the jury, in pertinent part, as follows:

> For you to find the defendant guilty of [aggravated kidnapping], the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendant knowingly removed or confined another person unlawfully so as to interfere substantially with the other's liberty; and
>
> That the defendant did so with the intent to inflict serious bodily injury or terrorize the alleged victim; or
>
> That the alleged victim suffered bodily injury; or
>
> That the defendant possessed or threatened the use of a deadly weapon.

-9-

The court also instructed the jury:

> Now unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged Aggravated Assault by Strangulation and was not essentially incidental to it, you must find the defendant not guilty of Aggravated Kidnapping.

*See generally White*, 362 S.W.3d 559.

The Defendant argues that the instruction misled the jury because it expanded the bases upon which the jury might convict him of aggravated kidnapping. He posits that the jury must have found him guilty of the offense based upon one of the modes of the offense enumerated in the instruction but not specified in the indictment, given the alleged deficiency of proof of bodily injury in addition to that relied upon by the State to establish aggravated assault by strangulation, and that this demonstrates the prejudice he suffered as a result of the instruction. He argues that the five elements required for plain error relief have been shown.

The State counters that the Defendant is not entitled to relief as a matter of plain error because he cannot demonstrate that consideration of the alleged error is necessary in order to do substantial justice. *See Adkisson*, 899 S.W.3d at 641-42. The State argues that evidence at the trial focused on the victim's bodily injury and did not include proof that the Defendant possessed a deadly weapon or that he intended to terrorize the victim. Thus, the State posits that the jury necessarily convicted the Defendant based upon the victim's suffering bodily injury as a result of the kidnapping, the mode of the offense charged in the indictment.

In his reply brief, the Defendant argues that the definition of "terrorized" included in the jury instructions permitted the jury to find the Defendant guilty if the kidnapping involved the Defendant's "us[ing] or threaten[ing] violence to intimidate or cause panic." *See* T.P.I.—Crim. 8.02 (citing Black's Law Dictionary (7th ed. 1999)). He points to proof that after the Defendant and the victim arrived outside his home, he slapped her, spit on her, and threatened to choke her again if she did not go inside.

Turning to the *Adkisson* factors, the record clearly establishes what occurred in the trial court. *Adkisson*, 899 S.W.2d at 641-42. We will consider the remaining factors.

The record reflects that a clear and unequivocal rule of law was breached. *See id.*; *see also State v. Bowman*, 327 S.W.3d 69, 94 (Tenn. Crim. App. 2009) ("[W]hen a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion

of the remaining theories.") (citing *State v. Wayne E. Mitchell*, No. 01C01-9209-CR-00295, 1993 WL 65844, at \*3 (Tenn. Crim. App. Mar. 11, 1993)).

Turning to whether a substantial right of the Defendant was adversely affected, we note that a criminal defendant has a right to a complete and accurate charge of the law. *See, e.g., State v. Howard*, 504 S.W.3d 260, 270 (Tenn. 2016); *Adkission*, 899 S.W.2d at 641-42. This right emanates from the right to a trial by jury guaranteed by the Sixth Amendment of the United States Constitution and Article I, section 6 of the Tennessee Constitution. *Howard*, 504 S.W.3d at 270. Because the charge given by the trial court was inaccurate, a substantial right of the Defendant was adversely affected.

Notwithstanding the Defendant's failure to raise this issue in the trial court, the record does not reflect that he waived it for tactical reasons. *See Adkisson*, 899 S.W.2d at 641-42. This prong of the *Adkisson* test is met.

Finally, we consider whether "consideration of the error is 'necessary to do substantial justice.'" *See id.* The jury was instructed both on the mode of aggravated kidnapping charged in the indictment and on two additional modes that were not charged in the indictment. As we concluded in section I, the evidence was sufficient to support the Defendant's conviction of aggravated kidnapping in which the victim suffered bodily injury. Relative to the two modes of the offense erroneously included in the jury instructions, the Defendant notes, first, that the State offered no proof the Defendant possessed a deadly weapon during the kidnapping. He also argues that the proof of his intent to terrorize the victim is shown by his assaulting her outside his home during the kidnapping. We view this argument as strained, at best. The evidence of the Defendant's physical assault of the victim outside his home falls short of proof beyond a reasonable doubt that he kidnapped her with the intent to terrorize her. Despite the erroneous instruction, we cannot conclude that the jury convicted the Defendant of a mode of the offense for which the Defendant did not receive notice in the indictment. Therefore, we cannot conclude "the error is so significant that it 'probably changed the outcome of the trial.'" *See State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *Smith*, 24 S.W.3d at 282-83); *State v. Jay W. Edwards*, No. E2019-02176-CCA-R3-CD, 2021 WL 2554217, at \*17 (Tenn. Crim. App. Feb. 18, 2021) (holding that plain error relief was not required where jury was instructed on modes of the offense both charged and uncharged in the indictment and the evidence was sufficient to support the conviction as to the mode charged, and distinguishing cases in which only an uncharged mode of the offense was included in the jury instructions), *perm. app. denied* (Tenn. Nov. 17, 2021); *cf. State v. Warren Smith*, No. W2019-01882-CCA-R3-CD, 2020 WL 4246798, at \*7 (Tenn. Crim. App. July 28, 2020) (holding that plain error relief was necessary where the jury was not instructed on the mode of the offense charged in the indictment but was instructed on a separate mode which was not charged), *reh'g denied* (Aug. 17, 2020). *But see State v. Michael Smith*, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at \*7-8 (Tenn. Crim.

App. July 12, 2013) (granting relief as a matter of plain error where the trial court included in the jury instructions modes of the offense both charged and uncharged in the indictment).

Because the Defendant has not established that all five of the *Adkisson* factors exist, he is not entitled to plain error relief based upon the trial court's erroneous jury instructions.

## III

### Impeachment with Prior Convictions

The Defendant contends that the trial court erred in allowing the State to impeach the Defendant with his prior convictions under Tennessee Rule of Evidence 609. He argues that the probative value of impeachment with his prior convictions for sexual battery by an authority figure and multiple violations of the sex offender registry law did not outweigh their unfair prejudicial effect on the substantive issues. The State responds that the Defendant waived consideration of the issue by failing to raise it in the motion for a new trial and that, in any event, he is not entitled to relief as a matter of plain error. The Defendant responds that he is entitled to plain error relief. We agree with the State that the issue was waived and that the Defendant has not established that he is entitled to plain error relief.

Before the Defendant began his case-in-chief, defense counsel requested a hearing pursuant to Tennessee Rule of Evidence 609 regarding the State's ability to impeach the Defendant with the prior convictions. The defense argued that the prejudice from evidence of the sexual offender registry violation convictions outweighed their probative value because the present case "involves alleged accusations of violence against a lady." The State argued that the prior conviction offenses were not similar because the present case did not involve allegations of a sexual offense. The trial court ruled that the State could impeach the Defendant with the sexual battery by an authority figure conviction and with two of the violating the sexual offender registry convictions.

Thereafter, the Defendant acknowledged on direct examination that he had "three prior felony convictions," and on cross-examination, the State inquired about the Defendant's recollection regarding the specific conviction offenses. Although the Defendant claimed to remember only one conviction for violating the sexual offender registry, he stated that the conviction arose after he failed "to report to them that [he] was working at a job." In its final instructions, the court told the jury that their consideration of the prior convictions was limited to the convictions' effect on the Defendant's credibility.

Tennessee Rule of Evidence 609 permits the use of previous convictions to impeach a witness's credibility so long as the crime was punishable by death or imprisonment of

more than one year or the crime involved dishonesty or false statements. Tenn. R. Evid. 609(a)(2). Impeachment evidence admitted pursuant to Rule 609(a) "is limited to the fact of a former conviction and that the crime was committed." *State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999). Previous convictions cannot be admitted as evidence to show a defendant's propensity to commit the charged offense, regardless of whether witness credibility is a central issue at a trial. *See* Tenn. R. Evid. 404(b). In determining the admissibility of a defendant's previous conviction pursuant to Rule 609, a trial court must make findings relative to whether the conviction's probative value on the Defendant's credibility outweighs the unfair prejudicial effect on the substantive issues raised during the trial. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000); *see State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). Therefore, a trial court "must analyze the relevance the impeaching conviction has to the issue of credibility," "explain [the relevance] on the record," and "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id*. (internal quotation marks and citations omitted); *see State v. Waller*, 118 S.W.3d 368 (Tenn. 2003); Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.09[10][c] (6th ed. 2011). "If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination." Tenn. R. Evid. 609(a)(3).

Relative to credibility, violent crimes "might reflect on the moral character of a witness and therefore are not without probative value on credibility." Cohen, § 6.09[10][c]; *see State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (stating "felonies of a violent nature reflect on the moral character of a witness . . . [, and] this evidence is not usually without probative value"). However, "the link between [violent] crime and truthfulness is, at best, weak and the potential prejudice is significant." Cohen, § 6.09[10][c]; *see State v. Barnard*, 899 S.W.2d 617, 621-23 (Tenn. Crim. App. 1994); *Long v. State*, 607 S.W.2d 482, 485-86 (Tenn. Crim. App. 1980) (stating crimes involving assaultive conduct might result from causes that have "little or no direct bearing on honesty or veracity").

As the State correctly notes, the Defendant did not raise the Rule 609 issue in the motion for a new trial. *See* T.R.A.P. 3(e). Plenary review is waived, and our consideration is limited to one for plain error. *Id.*; *Adkisson*, 899 S.W.2d at 641-42.

Turning to the *Adkission* factors, we conclude that the record clearly establishes what occurred in the trial court and that the record does not reflect that the issue was waived for tactical reasons. *See Adkisson*, 899 S.W.2d at 641-42.

Regarding the remaining factors, the record reflects that the trial court found that the prior convictions and the conduct alleged in the present case were not substantially similar. The court applied an incorrect standard, finding "that the probative value is not

*substantially* outweighed by any prejudicial value." Essentially, this is the balancing test for Tennessee Rule of Evidence 403. To repeat, the balancing test for Rule 609 requires that the probative value of the evidence on the Defendant's credibility outweigh the unfair prejudicial effect on the substantive issues. *See Thompson*, 36 S.W.3d at 109 (Tenn. Crim. App. 2000); *see also Mixon*, 983 S.W.2d at 674.

Notwithstanding the court's misapplication of the law, the record does not reflect that the trial court violated a clear and unequivocal rule of law in admitting the evidence pursuant to Rule 609. As the trial court correctly noted, the prior convictions and the crimes on trial were not similar in nature, limiting concerns about the unfair prejudicial effect of the evidence of the prior convictions on the substantive issues. The court instructed the jury that its use of the evidence of the prior convictions was limited to issues involving the Defendant's credibility. A jury is presumed to follow the court's instructions. *See, e.g.*, *State v. Clark*, 452 S.W.3d 268, 293 (Tenn. 2014). We also cannot conclude that a substantial right of the Defendant's was adversely affected or that consideration of the error is necessary to do substantial justice. *See Adkisson*, 899 S.W.2d at 641-42; *Dorman O'Neal Elmore, Jr. v. State*, No. E2005-02263-CCA-R3-PC, 2006 WL 2482949, at *3 (Tenn. Crim. App. Aug. 29, 2006) ("Rarely will plain error review extend to an evidentiary issue."), *perm. app. denied* (Tenn. Dec. 18, 2006).

The Defendant has not established that plain error relief is required. He is not entitled to relief on this basis.

## IV

## Cumulative Error

The Defendant contends that he should receive a new trial due to the prejudice accruing from the cumulative effect of the trial court's jury instructions on aggravated kidnapping and the evidentiary ruling on the prior convictions. The State responds that cumulative error relief is not required. We agree with the State.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

-14-

We have determined that no plain error exists as to either of the individual issues. Upon consideration of the issues in question, we conclude that cumulative error relief is not appropriate. The Defendant is not entitled to relief on this basis.

**V**

**Sentencing**

Finally, the Defendant contends that the trial court erred in classifying him as a Range III, persistent offender for his aggravated assault conviction and that he should be resentenced as a Range II offender. He argues that the State failed to prove that a prior Georgia conviction qualified as a felony under Tennessee law and that without inclusion of this conviction as a prior felony conviction, he qualified only as a Range II offender. The State agrees that the court erred in imposing a Range III sentence and proposes that this court impose a Range II, ten-year sentence. The Defendant responds that this court should not resentence him to ten years and should, instead, remand the case to the trial court for resentencing. We conclude that the parties are correct that the Defendant should have been sentenced as a Range II offender, and we modify his aggravated assault sentence length to ten years, the maximum Range II sentence for the offense.

**A. Range Classification**

The State filed a Notice of Intent to Seek Enhanced Punishment which listed four Tennessee felony convictions: Class D felony evading arrest, Class C felony sexual battery by an authority figure, and two counts of Class E felony violating the sexual offender registry. The presentence report, which was received at the sentencing hearing, listed four Tennessee felony convictions and numerous additional misdemeanor convictions from Tennessee and Georgia. Documents memorializing the Defendant's February 6, 1997 guilty plea in Georgia for the offense of cruelty to children was received as an exhibit at the hearing. A sentencing document included in the exhibit reflected that the Defendant pleaded guilty and agreed to a three-year split confinement sentence, consisting of 180 days in jail and the balance on probation.

The State took the position at the sentencing hearing that the Defendant was a Range II offender for the aggravated kidnapping conviction and a Range III offender for the aggravated assault conviction. Relative to the Range III sentencing, the State relied upon the four Tennessee felonies and the Georgia cruelty to children conviction. The trial court asked defense counsel, "[D]o you agree with those ranges?" Defense counsel responded, "Yes, sir." The court proceeded to sentence the Defendant to twenty years at 100% for aggravated kidnapping and to fifteen years as a Range III, persistent offender. The court ordered that the sentences be served consecutively.

-15-

The Sentencing Reform Act defines Range II and Range III offenders as follows:

(a) A multiple offender is a defendant who has received:

(1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable; or

(2) One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

T.C.A. § 40-35-106(A)(1)-(2) (2019) (subsequently amended).

(a) A persistent offender is a defendant who has received:

(1) Any combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes, where applicable; or

(2) At least two (2) Class A or any combination of three (3) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or B felony.

*Id.* § 40-35-107(a)(1)-(2) (2019) (subsequently amended). The State must prove beyond a reasonable doubt that a defendant qualifies for enhanced range sentencing. *Id.* §§ 40-35-106(c), -107(c).

Despite the statutory requirement that the range classification be proven beyond a reasonable doubt, the State did not offer proof beyond the presentence report and the Georgia documents, and the Defendant agreed to the sentencing range proposed by the State. Against this backdrop, the trial court did not make specific findings related to the proof of the Defendant's range classifications for the respective offenses. In its brief, the State says, "Though the State relied on a Georgia conviction to establish the necessary fifth predicate felony [for Range III sentencing], that offense does not constitute a felony in Tennessee." Thus, we conclude that the State concedes it cannot establish beyond a reasonable doubt that the Georgia offense is a felony which could be relied upon as a predicate felony for Range III sentencing.

The record reflects that the Defendant has four felony convictions that are "within the conviction class, a higher class, or within the next two (2) lower felony classes" of his Class C felony conviction for aggravated assault. *See id.* § 40-35-106(a)(1). He is a Range

II offender.  The trial court erred in sentencing him as a Range III offender for aggravated assault, and the judgment must be corrected to reflect the correct range classification.

## B.      Length of Aggravated Assault Sentence

Because the Defendant was erroneously sentenced as a Range III offender, the trial court utilized the wrong sentencing range in determining the length of the Defendant's sentence.  *See id.* § 39-13-102(e)(1)(A)(ii) (Supp. 2015) (subsequently amended) (classifying aggravated assault involving strangulation as a Class C felony).  *Compare id.* § 40-35-112(b)(3) (2019) (six-to-ten-year sentencing range for Range II offenders convicted of a Class C felony) *with id.* § 40-35-112(c)(3) (ten-to-fifteen-year sentencing range for Range III offenders convicted of a Class C felony).  Thus, the length of his sentence must be reconsidered.

An appellate court is authorized to "[a]ffirm, reduce, vacate or set aside the sentence imposed."  *Id.* § 40-35-401(c)(2) (2019).  The Defendant does not contend that the trial court erred in its application of enhancement factors or that it failed to apply mitigating factors.  Likewise, he does not quibble with the imposition of consecutive sentences.  Thus, the only issue to be resolved is the appropriate length of the Range II aggravated assault conviction.

A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment.  T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

The record reflects that the trial court considered the relevant factors.  It considered the statutory enhancement and mitigating factors and made appropriate findings based upon the evidence before it, after which the judge stated, "I'm having a hard time figuring out why the maximum sentence wouldn't apply in these cases, given the circumstances." The court then imposed the maximum sentence for each conviction.  Based upon the court's determination that the Defendant should receive maximum sentences, we modify the length of the Defendant's aggravated assault conviction to the Range II maximum of ten years. We acknowledge the Defendant's argument that this court should remand the case for a determination regarding the length of the aggravated assault sentence, but the record is sufficient for this court to determine that the trial court's intent was for the Defendant to

receive a maximum sentence. Remand for further consideration of the sentence is neither necessary nor would further the interests of judicial economy. *See* T.C.A. § 40-35-401(c)(2).

Finally, we note that the Defendant has not challenged the imposition of consecutive sentencing and has conceded to this court that he qualified as "an offender whose record of criminal activity is extensive." *See id.* § 40-35-115(b)(2) (2019 (subsequently amended) (permitting consecutive sentencing on this basis). The many prior convictions listed in the presentence report, which span several pages, bear out this concession.

The Defendant's convictions are affirmed. The sentence for aggravated assault is modified to ten years in the Department of Correction as a Range II offender, to be served consecutively to the sentence for aggravated kidnapping.

_____
ROBERT H. MONTGOMERY, JR., JUDGE